LIA COMERFORD
OSB No. 141513
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211-0374
Phone: 971-717-6420
Email: lcomerford@biologicaldiversity.org

LINDSAY REEVES
*(Pro hac vice* forthcoming)
La. Bar No. 32703
Center for Biological Diversity
3436 Magazine Street, FRNT PMB 539
New Orleans, LA 70115
Phone: 504-342-4337
Email: lreeves@biologicaldiversity.org

*Attorneys for Plaintiff*
*Additional counsel on signature page*

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**EUGENE DIVISION**

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY**,<br><br>Plaintiff,<br><br>v.<br><br>**U.S. FISH AND WILDLIFE SERVICE**, **BRIAN NESVIK,** in his official capacity as Director of the U.S. Fish and Wildlife Service**,** **KESSINA LEE,** in her official capacity as State Supervisor of U.S. Fish and Wildlife Service's Oregon Fish and Wildlife Office, **U.S. BUREAU OF LAND MANAGEMENT, STEVAN PEARCE,** in his official capacity as Director of the U.S. Bureau of Land Management, and **DOUG BURGUM**, in his official capacity as Secretary of the U.S. Department of the Interior,<br><br>Defendants. | Case No. 26-cv-02557<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1. Plaintiff Center for Biological Diversity brings this action pursuant to the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, challenging final agency actions of the U.S. Fish and Wildlife Service ("FWS") and the Bureau of Land Management ("BLM") under the ESA relating to the Marbled Murrelet Management Direction (the "Murrelet Management Direction" or the "Direction") in BLM's western Oregon Resource Management Plans ("RMPs").

2. In 2016, BLM revised its Northwestern and Coastal Oregon and Southwestern Oregon RMPs. Among many other things, the RMPs establish a Murrelet Management Direction that BLM must follow to protect the marbled murrelet, a small, forest-dwelling seabird that has been listed as threatened under the ESA since 1992.

3. In accordance with section 7 of the ESA, BLM consulted with FWS on the effects of the RMPs to listed species, including the murrelet, culminating in FWS issuing a Biological Opinion ("RMP BiOp"). Based on BLM's description of the RMPs and FWS's extensive analysis of their protections for murrelets, including the overarching protection afforded by the Murrelet Management Direction, FWS determined that the RMPs would not jeopardize murrelets or destroy or adversely modify their critical habitat. FWS also found that the RMPs would increase protections for murrelets as compared to the prior management under the Northwest Forest Plan ("NWFP") and put the species on a trajectory towards recovery. These determinations and findings were premised upon FWS's interpretation of the Direction and the "overarching protections" the Direction provided to murrelets.

4. However, in 2018, just two years later, BLM issued an internal clarification of its interpretation of the Murrelet Management Direction. This clarification redefined, and narrowed,

when and how the Direction's protections would be triggered, significantly weakening the murrelet protections that FWS expressly relied upon when making its no jeopardy and no adverse modification determinations in the RMP BiOp and fundamentally undermining FWS's carefully considered effects analysis and conclusions in that BiOp. According to BLM, FWS had "mischaracterized" the Direction during the consultation process.

5. In response to this significant change, FWS sent BLM a three-page memo with an attached "Effects Analysis" and "7(a)(2) Analysis" (hereafter, the memo and attachment are collectively referred to as the "Effects and 7(a)(2) Analysis Memo" or "Memo"). In this Memo, FWS reiterated its interpretation of the Murrelet Management Direction and that the RMP BiOp's analysis and conclusion rested on the interpretation of the Direction, and recommended that BLM continue to apply that interpretation. However, FWS then immediately contradicted itself by concluding, in a highly cursory, incomplete, and arbitrary and capricious manner, that the modified Direction would not jeopardize murrelets or destroy or adversely modify their critical habitat. In addition to suffering from significant substantive flaws, FWS also subverted, and failed to comply with, the ESA's procedural consultation requirements, which act as a safeguard to ensure that agencies consider the effects of their actions to listed species and their critical habitat.

6. For these violations, the Center asks that this Court declare FWS's Effects and 7(a)(2) Analysis Memo invalid and vacate and set aside that Memo or, alternatively, find that BLM and FWS have violated the ESA by failing to reinitiate consultation on BLM's RMPs; and enjoin BLM from authorizing or implementing any logging activities and sales under the RMPs until BLM and FWS complete reinitiated consultation on the modified Marbled Murrelet Management Direction.

## JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

7. This Court has jurisdiction over this action pursuant to 16 U.S.C. § 1540(c),(g) (action arising under ESA citizen suit provision); 5 U.S.C. § 702 (APA review); and 28 U.S.C. § 1331 (federal question jurisdiction).

8. The Court may grant the relief requested under the ESA, 16 U.S.C. § 1540(g); the APA, 5 U.S.C. §§ 701–706; and 28 U.S.C. §§ 2201–2202 (declaratory and injunctive relief).

9. Venue is proper in this District under 28 U.S.C. § 1391(e) because all, or a substantial portion, of the events or omissions giving rise to this litigation occurred within the District of Oregon. Venue is also proper in this Court under 16 U.S.C. § 1540(g)(3)(a) because the ESA violations occurred in this District.

10. Assignment to the Eugene Division is appropriate under Local Rule 3-2 because timber sales implementing the modified Direction and the BLM Office responsible for those sales are situated in Coos County, Oregon.

## PARTIES

11. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a national, non-profit conservation organization that works through science, law, and the creative media to protect endangered species and their habitats, including the marbled murrelet. The Center has more than 130,000 members, many of whom live and recreate in Oregon within the range of the threatened marbled murrelet. The Center is headquartered in Tucson, Arizona, with offices throughout the United States, including in Oregon.

12. The Center brings this action on behalf of itself and its members who derive recreational, aesthetic, educational, scientific, professional, and other benefits from the marbled murrelet and its habitat. The interests of the Center's and its members in protecting and

recovering the murrelet and its habitat are directly harmed by FWS's arbitrary and capricious decision-making and BLM's and FWS's failure to comply with the ESA with regard to protections of murrelets on BLM's western Oregon lands.

13. For example, Center member Noah Greenwald has worked as a murrelet surveyor and has visited marbled murrelet habitat in the Oregon Coast Range and elsewhere on multiple occasions with the purpose of hearing or seeing a murrelet and enjoying the old-growth forests on which they depend. As a resident of Portland, Oregon, Mr. Greenwald regularly visits and recreates in coastal Oregon, where murrelets occur, and plans to continue these visits in the future. On these trips, when he is in or near murrelet habitat, he listens and looks for murrelets. Mr. Greenwald is saddened by the loss of old-growth forests and murrelet habitat to careless logging and the resulting reduction in places where he can visit western Oregon and attempt to see or hear murrelets.

14. Center member Francis Eatherington lives in Roseburg, Oregon, close to BLM's Coos Bay District. Ms. Eatherington has been an advocate for protecting and conserving western Oregon mature forests for decades, including the BLM forests near her home that are being, and will continue to be, logged and otherwise managed pursuant to BLM's RMPs. One such logging project near Ms. Eatherington's home in Roseburg is BLM's Big Weekly Elk Forest Management Project, a logging project in BLM's Coos Bay District where BLM is implementing the modified Direction and allowing logging in and adjacent to the murrelet's old-growth forest habitat. As part of her forest advocacy efforts, during the planning stage for Big Weekly Elk, Ms. Eatherington visited some of the proposed logging units and submitted comments on the project, including commenting that the Project would harm murrelets and their habitat.

15. Ms. Eatherington believes that murrelets, and biodiversity generally, have

inherent value, and she finds spiritual connection with nature around her. From Ms. Eatherington's home, it is only a short drive west to BLM lands, including the Coos Bay Oregon & California Railroad Revested Lands in and around the checkerboarded area that includes Big Weekly Elk. She enjoys visiting these lands as well as the Elliott State Forest in northern Coos County to recreate, explore mature forests, look for wildlife and their habitat, and monitor logging projects. She also regularly drives past and through these lands on the way from her home to the Oregon Coast. She plans to continue viewing and visiting these areas throughout 2026 and 2027 and into the future. Ms. Eatherington is concerned that BLM's logging will lessen her enjoyment of BLM lands and the surrounding forest near her home because of its negative impacts to murrelets and their habitat that she has dedicated much of her life to protecting.

16. Defendant U.S. FISH AND WILDLIFE SERVICE ("FWS") is an agency within the U.S. Department of the Interior. FWS is responsible for administering the ESA for terrestrial wildlife and their critical habitat, including marbled murrelets. FWS prepared and issued the Effects and 7(a)(2) Analysis Memo challenged in this lawsuit.

17. Defendant BRIAN NESVIK is the Director of FWS and is charged with administering and implementing the ESA. Director Nesvik is sued in his official capacity.

18. Defendant KESSINA LEE is the State Supervisor for FWS's Oregon Fish and Wildlife Office. Ms. Lee's predecessor signed the Effects and 7(a)(2) Analysis Memo. Ms. Lee is sued in her official capacity.

19. Defendant U.S. BUREAU OF LAND MANAGEMENT ("BLM") is an agency within the U.S. Department of the Interior charged with managing the federal public lands and resources at issue in this case and is the action agency under the ESA for purposes of the ESA consultation.

20. Defendant STEVAN PEARCE is the Director of the Bureau of Land Management and is charged with ensuring that BLM complies with all federal laws and regulations, including the ESA. Director Pearce is sued in his official capacity.

21. Defendant DOUG BURGUM is the Secretary of the U.S. Department of the Interior and has the ultimate responsibility to administer and implement the provisions of the ESA. Defendant Burgum is sued in his official capacity

## LEGAL BACKGROUND

### The Endangered Species Act

22. The Endangered Species Act, 16 U.S.C. §§ 1531–1544, is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). Its fundamental purposes are "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species and threatened species . . . ." 16 U.S.C. § 1531(b). The ESA defines "conservation" to mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary." 16 U.S.C. § 1532(3).

23. To achieve these objectives, the ESA directs the Secretary of the Interior, through FWS, to determine which species of plants and animals are "threatened" and "endangered" and place them on the list of protected species, and to designate "critical habitat" for such species. 16 U.S.C. § 1533. An "endangered" or "threatened" species is one "in danger of extinction throughout all or a significant portion of its range," or "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range," respectively. *Id.*

§§ 1532(6), (20). Critical habitat is defined as "(i) the specific areas within the geographical area occupied by the species, at the time it is listed . . ., on which are found those physical or biological features [] essential to the conservation of the species and [] which may require special management considerations or protections; and (ii) specific areas outside the geographical area occupied by the species at the time it is listed . . ., upon a determination by the Secretary that such areas are essential for the conservation of the species." *Id.* § 1532(5)(A).

24. Once a species is listed, the ESA provides a variety of procedural and substantive protections to ensure not only the species' continued survival, but its ultimate recovery, including the designation of critical habitat, the preparation and implementation of recovery plans, the prohibition against the "taking" of listed species, and the requirement for interagency consultation. 16 U.S.C. §§ 1533(a)(3), 1533(f), 1536, 1538.

25. The ESA recognizes that federal agencies have a critical role to play in meeting the ESA's statutory purposes. The ESA establishes that it is "the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes" of the ESA. 16 U.S.C. § 1531(c)(1).

26. To help implement this policy, section 7(a)(2) of the ESA requires that "[e]ach Federal agency shall, in consultation with . . . [FWS], [e]nsure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat." 16 U.S.C. § 1536(a)(2). This provision contains both procedural and substantive mandates. Substantively, it requires that all federal agencies avoid actions that: (1) jeopardize the continued existence of listed species; or (2) destroy or adversely modify their

designated critical habitat. Procedurally, to ensure compliance with the substantive standards, the action agency and FWS take part in a cooperative analysis of potential impacts to listed species and their designated critical habitat known as the consultation process. *Id.* § 1536(a)(2). This process has been described as the "heart of the ESA." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495 (9th Cir. 2011). An agency "action" is "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies." 50 C.F.R. § 402.02. ESA consultation may focus on a single agency action, or it may be a "programmatic consultation" that "address[es] an agency's multiple actions on a program, region, or other basis." *Id.*

27. During section 7 consultation, federal agencies must "use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); *see also* 50 C.F.R. § 402.14(d).

28. The consultation process starts with the action agency requesting from FWS a list of any listed species or proposed species or critical habitat that may be present in the project area. 16 U.S.C. § 1536(c)(1). If any such species may be present, the action agency must prepare a "biological assessment" to determine whether the proposed action may affect the listed species. 16 U.S.C. § 1536(c)(1); *see also generally,* 50 C.F.R. § 402.12.

29. If the action agency determines that its proposed action may affect any listed species or critical habitat, the agency must normally engage in "formal consultation" with FWS. *See generally*, 50 C.F.R. § 402.14. However, the agency need not initiate formal consultation if, as a result of the preparation of a biological assessment or informal consultation with FWS, the agency determines, with FWS's written concurrence (also referred to as a "letter of concurrence"), that the proposed action is not likely to adversely affect any listed species or critical habitat. *Id.* §§ 402.13, 402.14(b)(1).

30. In formal section 7 consultation, FWS prepares a BiOp evaluating whether the action is likely to "jeopardize the continued existence" of a species or destroy or adversely modify its critical habitat and, if so, suggests "reasonable and prudent alternatives" to avoid that result. 50 C.F.R. § 402.14(h); *see also* 16 U.S.C. § 1536(b)(3)(A). "Jeopardize the continued existence of means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. To reach its jeopardy conclusion, FWS must assess the effects of the action and cumulative effects on those species and habitats and analyze whether the effects of the action, when added to the environmental baseline together with any cumulative effects, are likely to jeopardize the continued existence of the species or adversely modify their critical habitats. 50 C.F.R. § 402.14(g).

31. If the BiOp concludes that the action is not likely to jeopardize a listed species, and will not result in the destruction or adverse modification of critical habitat, FWS must provide an "incidental take statement," specifying the amount or extent of such incidental taking on the species and any "reasonable and prudent measures" that FWS considers necessary or appropriate to minimize such impact, and setting forth the "terms and conditions" that must be complied with by the action agency to implement those measures. 16 U.S.C. § 1536(b)(4); *see also* 50 C.F.R. § 402.14(i).

32. Reinitiation of consultation is required and must be requested by either the action agency or FWS where discretionary federal involvement or control over the action has been retained or is authorized by law and: (a) the amount or extent of taking specified in the incidental take statement is exceeded; (b) new information reveals effects of the action that may affect

listed species or critical habitat in a manner or to an extent not previously considered; (c) the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence; or (d) a new species is listed or critical habitat designated that may be affected by the identified action. 50 C.F.R. § 402.16(a)(1)–(4) (2023).

33. After the initiation or reinitiation of section 7 consultation, the ESA prohibits the action agency from making any irreversible or irretrievable commitment of resources with respect to the agency action until the consultation is complete. 16 U.S.C. § 1536(d).

**The Administrative Procedure Act**

34. The APA provides a cause of action to any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute . . . ." 5 U.S.C. § 702.

35. Final agency actions are judicially reviewable under the APA if there is no other adequate remedy in a court. 5 U.S.C. § 704.

36. The APA requires that reviewing courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

37. An agency's decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## FACTUAL BACKGROUND

### Marbled Murrelets and their Habitat

38. The marbled murrelet (*Brachyramphus marmoratus*) is a small, diving seabird that forages in near-shore, coastal waters but nests in mature and old-growth forests of northern California, Oregon, and Washington.



*Juvenile Marbled Murrelet, USGS/R. Macintosh, Public Domain*

39. During the breeding season, which occurs between mid-April and September, murrelets fly up to 55 miles inland to nest in small depressions or cups made of moss or other debris on large branches or other suitable "platforms" high from the ground. Murrelets also use inland forest habitat outside of nesting season to conduct pre-nesting flights, often with other murrelets, and visit nest trees.

40. Platform presence is considered the most important characteristic of murrelet nesting habitat and generally only large, old trees contain suitable nesting platforms. Therefore, potential or suitable habitat for murrelet nesting consists of old-growth or mature forest habitat. Murrelet platforms are also occasionally found in younger coniferous forests with remnant large trees.

41. In addition to nesting platforms, other general characteristics of murrelet nesting habitat throughout its range include adequate canopy, larger patch size of mature forest, and

being within commuting distance to the marine environment.

42. Murrelets have a naturally low reproductive rate. Female murrelets generally lay one egg per year. Then, on a daily basis, the male and female incubate the egg in shifts while the other bird flies from the nest to the ocean to forage and then flies back to the nest with fish for the nestling.

43. Murrelets do not nest every year but have high "site fidelity," meaning that they nest in the same forest stands and often the same trees, and sometimes even the same specific branch or nesting cup from year to year. They do not usually nest in the same trees as one another, but they will nest in the same stand of trees, and the presence of murrelets in a stand may attract other pairs to currently unused habitat in the area.

44. Due to the murrelet's high site fidelity, once a forest stand is found to be occupied by murrelets, the stand is deemed permanently occupied.

45. In addition to needing mature and old-growth trees with nesting platforms to successfully reproduce, murrelets also need large, unfragmented, *i.e.*, contiguous, blocks of forest habitat. Larger blocks of habitat provide more canopy cover, layers, and complex structure, thus increasing the amount of core habitat and helping reduce predation and prevent microclimate impacts. Indeed, murrelets abandon highly fragmented areas over time.

46. Murrelet nests are exceedingly difficult to locate. Due to the risk of nest predation, murrelets are secretive when incubating eggs on the nest and feeding young, entering stands rapidly and remaining quiet at the nest site. They may only show activity near their nests once a day, typically under low-light conditions at dusk or dawn. Further, during breeding season marbled murrelet feathers are brown and white, blending into the forest environment and making them difficult to spot.

**Impacts of Logging to Murrelets**

47. Logging in or adjacent to murrelet habitat has significant consequences for murrelets, including, for example, eliminating nests, displacing breeding murrelets, lowering nest success, and reducing abundance.

48. Logging impacts the nesting structure murrelets depend on by removing trees with nesting platforms, removing branches that serve as nesting platforms, or removing trees with branches intertwined with nesting platforms in adjacent trees.

49. Logging also fragments the landscape, reducing interior or core habitat and creating small patches of habitat with forest edges that expose murrelets to threats, such as predation and changes in microclimate, thereby reducing both the quantity of murrelet habitat and the quality of remaining habitat.

50. Converting large tracts of forest into small, fragmented patches causes "edge effects" that negatively impact murrelets and their habitat, including increased windthrow, unfavorable changes in microclimate and vegetation, and increased predator numbers and access. These edge effects contribute significantly to murrelet nesting failure.

51. Forest edges lead to an increase in predation, which is the highest known cause of murrelet nest failure in recent decades and thought to be a limiting factor to murrelet populations. Marbled murrelet nests are preyed upon primarily by corvids, including crows, jays, and ravens, who proliferate near forest edges. Forest clearings lead to an increase in berry bushes and insects, which provide nesting habitat and food for corvids. Predation further increases in intensity where edges are near human development such as campgrounds.

52. Windthrow, or the uprooting or breakage of trees by wind, is increased when logging and roads increase the exposure of trees to wind. Windthrow can affect murrelets by, for

example, causing the loss of or physical damage to nest trees or limbs, or blowing moss off nesting platforms. Changes in microclimates caused by the creation of forest edges can affect murrelets by causing thermal stress or dehydration if birds are exposed to direct sunlight or increased winds, as well as by decreasing the amount of moss and other epiphyte growth that murrelets depend on for their nest pads.

53. Edge effects are generally thought to penetrate 240 to 300 feet into old-growth forests adjacent to clearcuts or other hard edges, although one study recorded fundamental changes in microclimate at least as far as 787 feet from the forest edge.

54. To minimize the negative impacts of logging and edge effects to murrelets, for decades scientists have recognized the importance of establishing, at a minimum, 300-to-600-foot buffers around occupied murrelet habitat wherein no logging activity could occur.

55. Buffer habitat also provides other essential functions to murrelets. For example, protecting younger forests around occupied stands helps increase small forest patch sizes and reduce fragmentation, and allows younger forest stands to develop into the later-successional forest stands needed for murrelet conservation. Further, studies have documented murrelets using below-canopy flight corridors to access nest sites, which may protect murrelets and their nests from predators. Providing a minimum 300-foot-wide no-cut buffer area around occupied murrelet habitat protects these important below-canopy flight corridors.

**Federal Protections for Murrelets and their Habitat**

56. Beginning in the 1920s and extending through the 1980s, logging in Oregon’s mature and old growth forests decimated the murrelet’s habitat. By about the 1990s, Oregon’s western old-growth forests had been reduced by about 82 percent compared to pre-logging levels. The remaining forest exists in mostly small, fragmented patches or in forest parks and

reserves.

57. In 1992, the Service listed the marbled murrelet as threatened under the ESA. *See generally*, FWS, Endangered and Threatened Wildlife and Plants; Determination of Threatened Status for the Washington, Oregon, and California Population of Marbled Murrelets, 57 Fed. Reg. 45328 (Oct. 1, 1992). In so doing, FWS found that the principal factor affecting murrelets and the main cause of their population decline was “the loss of older forests and associated nest sites,” due primarily to commercial timber harvest, but also fire and windthrow. *Id.* at 45330. In 1996, FWS designated critical habitat for the murrelet. *See generally*, FWS, Endangered and Threatened Wildlife and Plants; Final Designation of Critical Habitat for the Marbled Murrelet, 61 Fed. Reg. 26256 (May 24, 1996).

58. In 1997, FWS issued a recovery plan for the murrelet. In the recovery plan, FWS recognized that certain factors—including the species’ specific nesting habitat requirements, life history strategy, low reproductive rate, and low current breeding success and recruitment rate—were likely to lead to a decreasing population that could not easily recover from further catastrophic events.

59. Because it can take nesting habitat at least 100 to 200 years to develop, the recovery plan set forth several “critical” recommendations to help stabilize murrelet populations in the short term, including maintaining occupied habitat, maintaining large blocks of suitable habitat, and maintaining and enhancing buffer habitat. Long-term actions included increasing the amount, quality, and distribution of suitable murrelet nesting habitat. The recovery plan also recognized the importance of surveying for murrelets and protecting occupied habitat to the overall recovery of the species.

60. In December 1994, shortly after murrelets were listed under the ESA, the Forest

Service and BLM adopted the Northwest Forest Plan ("NWFP"), which amended the existing National Forest and Resource Management Plans. Among other things, the NWFP adopted a system of reserved lands—including late-successional reserves ("LSRs"), riparian reserves, and congressionally reserved lands—across BLM and Forest Service lands in Oregon, Washington, and northwestern California where logging was, for the most part, prohibited.

61. The LSRs were designed to protect and enhance the late successional and old-growth forest ecosystems that serve as habitat for species that depend on such ecosystems, including the marbled murrelet. With limited exceptions, the NWFP prohibited logging in stands over 80 years old in the LSRs, and only allowed thinning in stands up to 80 years old where that thinning helped create or maintain late-successional forest conditions. The LSRs encompass a significant portion of murrelet nesting habitat on federal lands.

62. Further, the NWFP required murrelet surveys prior to logging on federal lands in the murrelet's range. For surveys with positive occupancy results, the NWFP prohibited logging in all contiguous nesting habitat and recruitment habitat within a half-mile radius of the occupied site. All occupied murrelet sites were placed in the LSRs, and if new murrelet sites were found outside the LSRs, that habitat was re-designated as LSR. This survey requirement was assumed to prevent the loss of any occupied sites from logging.

63. Because of murrelets' cryptic nature, locating murrelet nests is difficult. In 2003, scientists with the Pacific Seabird Group developed the inland survey protocol (the "PSG Protocol") for surveying murrelets and inferring, based on observing certain "occupied behaviors," that there is a high likelihood a forest stand contains an active nest, nest tree, or tree essential to murrelet reproduction. These behaviors include seeing murrelets fly into the canopy, circling close above the canopy, landing in trees, flying through the forest beneath the canopy,

and calling from a stationary perch, as well as finding eggshell fragments or young on the forest floor.

64. Murrelet behavior showing that a forest stand is occupied does not necessarily indicate where a nest is located within the stand. Further, murrelets use forested areas for purposes other than nesting, such as courtship displays that take place near, but not at, the breeding site. Therefore, under the 2003 PSG Protocol, when occupied behavior is detected, the entire stand is classified as an "occupied site."

**BLM's Resource Management Plans and the Murrelet Management Direction**

65. In 2016, BLM withdrew from the NWFP and promulgated revised RMPs to provide management direction for its nearly 2.5 million acres of land in western Oregon. The management direction identifies what future actions may or may not be allowed within the LSRs and other BLM land use allocations.

66. According to BLM, the RMPs would more effectively contribute to the conservation and recovery of marbled murrelets than the NWFP because they would allocate more acres to the LSRs and increase the amount of old-growth forest. To that end, the RMPs' management direction for the LSRs directs BLM to protect occupied marbled murrelet stands by prohibiting activities in occupied stands, with limited exceptions. The RMPs further require that BLM allocate stands discovered occupied by marbled murrelets after March 26, 2015, to the LSRs.

67. The RMPs also included a Murrelet Management Direction, which is intended to protect murrelets by prohibiting, with limited exceptions, logging and associated activities that disrupt murrelets or modify occupied nesting habitat. The protections differ based on how far inland the activity occurs from the coastline, with the strongest protections applying between the

coastline and 35 miles inland—where the majority of murrelets nest ("Inland Zone 1")—and lesser protections extending to activities between 35 to 50 miles inland ("Inland Zone 2").

68. In pertinent part, the Murrelet Management Direction provides that, "[b]efore modifying nesting habitat or removing nesting structure" in all BLM lands in Inland Zone 1, BLM must "assess the analysis area for marbled murrelet nesting structure." The analysis area is the proposed project and land within 726 feet of the project, and includes all nesting structure that could be affected by habitat modification. If there is no murrelet nesting structure within this analysis area, then no further consideration of marbled murrelet habitat is required. If the area contains nesting structure, then "[b]efore modifying forest stands in any 5-acre portion (using a 5-acre moving circle) of the analysis area that contains at least 6 trees with nesting structure," BLM must implement one of three options.

69. Option 1 requires surveying for murrelets pursuant to an accepted protocol. If occupancy is determined, then, with limited exceptions, no activities may be conducted within the occupied stand or within 300 feet of the stand. "Occupied stand" is defined as "all forest stands, regardless of age or structure, within 1/4 mile (1,320 feet) of the location of marbled murrelet behavior indicating occupancy and not separated from the location of marbled murrelet behavior indicating occupancy by more than 328 feet of non-forest." If there is no occupancy determined, then no further consideration of murrelet habitat is required.

70. Option 2 prohibits removing or damaging nesting structure and requires a 150-foot un-thinned buffer around all trees with nesting structure. Option 2 is available where BLM will maintain a post-project average canopy cover of 60 percent between 150 and 300 feet from trees with nesting structure and an average post-project canopy cover of at least 40 percent within the project area beyond 300 feet from all trees with nesting structure.

71. Option 3, which requires FWS's concurrence, allows BLM to manage nesting structure in a manner that would not adversely affect nesting murrelets, except to treat or protect stands from sudden oak death.

**FWS's and BLM's Consultation on the Resource Management Plans**

72. Pursuant to ESA section 7, BLM initiated consultation with FWS by preparing a biological assessment for the RMPs. The assessment determined that the RMPs may affect marbled murrelets and their critical habitat.

73. Based on information provided by BLM in its biological assessment, FWS prepared a BiOp assessing, among other things, the effects of the RMPs on marbled murrelets and their critical habitat over a 50-year time frame.

74. The BiOp's murrelet analysis was extensive—more than 200 pages—and evinced a mutual understanding between FWS and BLM that the RMPs would be more protective of murrelets than the NWFP. Under the RMPs, BLM would immediately add 79,500 acres to the reserve system (including 48,182 acres of murrelet nesting habitat). FWS also believed that, with the addition of the 300-foot buffer around occupied stands, the RMP would result in larger protected occupied murrelet sites than the NWFP, providing for ingrowth and reducing fragmentation of murrelet nesting habitat.

75. FWS's lengthy analysis and conclusions in its BiOp regarding the RMPs' impacts to marbled murrelets and their critical habitat were based on FWS's understanding of how BLM would apply the "overarching protection" of the Murrelet Management Direction. FWS's analysis and resulting conclusions were predicated on its understanding that both direct and indirect effects to nesting habitat would "modify nesting habitat," as that phrase is used in the Direction, and trigger the Direction's protections. As explained by FWS, "[t]o determine if

protective measures apply, BLM will conduct an analysis of all activities that modify nesting habitat or remove nesting structure. Modify nesting habitat includes affecting adjacent stands that would modify the nesting structures wind firmness, microclimate and/or predation risks."

76. Further, FWS believed that the 300-foot buffer would apply to stands adjacent to all occupied murrelet habitat, including stands designated as occupied under the NWFP as well as habitat found to be occupied under the RMPs. FWS also believed the 300-foot buffer would apply to murrelet habitat with unknown occupancy status and unoccupied potential habitat.

77. Based on this interpretation of the Direction and its understanding of how BLM would be implementing it, FWS determined that the Direction would prevent almost all adverse effects to individual marbled murrelets. For murrelets in Inland Zone 1, FWS concluded that the Direction would prevent all negative impacts to murrelets from logging activities. For murrelets in Inland Zone 2, FWS concluded that 39 occupied murrelet sites would be lost to logging in the Harvest Land Base ("HLB"), the BLM lands managed for timber production, over a 50-year period. Ultimately, FWS concluded that, "as proposed," the RMPs were not likely to jeopardize the continued existence of the murrelet or destroy or adversely modify murrelet critical habitat.

78. FWS's BiOp also included an extensive analysis evaluating the RMPs' consistency with the Murrelet Recovery Plan, concluding they were consistent with the Plan because, among other things, FWS believed the RMPs provided for a high potential for ingrowth of murrelet habitat in the LSRs and would improve the amount, quality, and distribution of murrelet habitat on BLM lands and potentially lead to an increase of murrelets on BLM lands.

79. FWS's conclusions regarding the RMPs' contribution to murrelet recovery were premised on FWS's interpretation of BLM's Murrelet Management Direction and how BLM would be implementing that Direction.

**BLM's Modification of the Murrelet Management Direction and FWS's Effects and 7(a)(2) Analysis Memo**

80. It took only two years for BLM to weaken the RMP's protections for murrelets. On or around June 19, 2018, in response to a question from BLM's Coos Bay District regarding the interpretation of the phrase "modifying nesting habitat" in the Murrelet Management Direction, BLM clarified that, contrary to how FWS had interpreted the Direction for purposes of the RMP BiOp, the phrase "modifying nesting habitat" referred to the "direct alteration" of murrelet habitat and that "[t]he requirement to 'assess the analysis area for marbled murrelet nesting structure'"—the first step in determining whether the Management Direction applies—"is not triggered by actions outside of nesting habitat unless the action would remove nesting structure." BLM described FWS's interpretation—that "[m]odify[ing] nesting habitat includes affecting adjacent stands that would modify the nesting structures wind firmness, microclimate and/or predation risks" (i.e., indirect effects)—as a "mischaracteriz[ation]" of the RMPs.

81. BLM's clarified interpretation of the Murrelet Management Direction is a significant modification from the version that FWS consulted on for the RMP, wherein FWS had interpreted the Management Direction as triggered by indirect effects, including edge effects. This change fundamentally undermined FWS's analysis in the RMP BiOp regarding the RMPs' effects to murrelets and their critical habitat.

82. Under BLM's modified interpretation, the Murrelet Management Direction is triggered far less frequently than it would have been under the version of the Direction on which FWS consulted. Therefore, murrelets are receiving far fewer protections than FWS expected would be occurring, and the conservation and recovery benefits that underpinned FWS's analysis and conclusions are not being realized. For example, in the RMP BiOp, FWS predicted that under the RMP, BLM would discover and protect 97 occupied murrelet sites by the end of 2023,

but in March 2022, BLM reported that from 2015 to 2020, it had only discovered 38 new occupied sites, meaning that far fewer sites and habitat were receiving the RMP's protections than FWS had anticipated.

83. On or around September 23, 2019, FWS sent BLM its short Effects and 7(a)(2) Analysis Memo, which addressed BLM's modification of the Murrelet Management Direction.

84. In three pages, FWS explained that its determination in the RMP BiOp that most habitat modification in Inland Zone 1 was not likely to adversely affect murrelets was based on its interpretation of the Murrelet Management Direction as being triggered by both direct and indirect effects to nesting habitat. FWS further explained that because it had believed that "modifying nesting habitat" included modifications due to indirect effects, its analysis in the RMP BiOp had included a 300-foot buffer around all occupied habitat, including occupied habitat delineated under the NWFP. However, in contrast to the interpretation that FWS had consulted on, BLM was only applying the 300-foot buffer to occupied sites delineated under the RMPs. FWS elaborated that, if it had applied BLM's interpretation of the Direction when preparing the RMP BiOp, it expected it would have concluded that habitat modification in Inland Zone 1 was likely to adversely affect marbled murrelets. In line with the extensive analysis from its RMP BiOp, FWS recommended that BLM provide a 300-foot buffer for all occupied murrelet sites in Inland Zone 1, including newly-delineated sites and sites designated as occupied under the NWFP.

85. FWS's Effects and 7(a)(2) Analysis Memo then attached a cursory, 14-page document that contradicted this recommendation and the RMP BiOp analysis.

86. In this attachment, FWS provided an "Effects Analysis" that provided a quantitative overview of how many acres of BLM land were within 300 feet of NWFP-occupied

murrelet sites and a summary of the science addressing effects to murrelets from harvesting buffer habitat. Then, in an approximately one-page "7(a)(2) Analysis," FWS restated the basis of the jeopardy analysis from the RMP BiOp and concluded that the additional impacts to murrelets did not change the jeopardy analysis or conclusion from the RMP BiOp. FWS did not provide a detailed discussion or explanation for how it reached this conclusion. It did not attempt to add or synthesize the effects to murrelets from BLM's modified Management Direction with the effects discussed in the RMP BiOp. FWS also did not offer an explanation or attempt to reconcile the inconsistency between its recommendation of a 300-foot buffer for all occupied murrelet sites in Inland Zone 1, with its no-jeopardy conclusion.

87. Further, FWS did not consider the effects that BLM's modified Murrelet Management Direction might have on murrelets beyond the 300-foot buffer issue. For example, FWS did not consider that, under BLM's interpretation that "modifying nesting habitat" only applies to direct effects and not indirect effects to nesting habitat (such as edge effects), the Direction and its ensuing protections—including, *e.g.*, the requirement under Option 1 to survey for marbled murrelets—would be triggered less frequently than FWS assumed in the RMP BiOp. Nor did FWS consider effects to murrelet critical habitat from BLM's modified Direction.

88. BLM did not prepare a biological assessment evaluating the effects of its modified Murrelet Management Direction to murrelets or their critical habitat, and FWS did not require such an assessment.

89. BLM's clarification of the Murrelet Management Direction was not publicly available or published in the Federal Register at the time it was issued.

90. FWS's Effects and 7(a)(2) Analysis Memo was not publicly available or published in the Federal Register at the time it was issued.

91. The Center did not learn of the existence of the modified Murrelet Management Direction or FWS's Effects and 7(a)(2) Analysis Memo until September 2025.

92. BLM has implemented and is continuing to implement its modified Murrelet Management Direction in numerous timber sales, including timber sales that are part of the Coos Bay District's Big Weekly Elk Project. This Project includes logging in and adjacent to murrelet nesting habitat. Contrary to FWS's understanding of how BLM would apply and implement the Direction, BLM is not applying the Direction to logging activities that cause indirect effects, including edge effects, to murrelet nesting habitat, including up to 55 occupied murrelet sites within the Project area. BLM is also not requiring a 300-foot buffer around all occupied marbled murrelet sites, in contrast to what FWS consulted on for purposes of evaluating the RMPs. Instead, BLM is allowing logging directly adjacent to occupied murrelet sites discovered under the NWFP.

93. BLM approved Big Weekly Elk in late 2021 and has sold numerous timber sales under the Project. To the best of Plaintiff's knowledge, at least three sales are under active timber sale contracts and logging is not yet complete for these sales. There are also several sales authorized as part of Big Weekly Elk that BLM has not yet sold, and one sale that was scheduled for auction on October 30, 2026.

94. BLM's modified Murrelet Management Direction has resulted, and is resulting, in significant effects to marbled murrelets and their nesting habitat from Big Weekly Elk and its implementing sales that FWS did not anticipate or consider when FWS consulted on the RMPs. For example, clear-cutting of a unit in the South Elk 23 Timber Sale is expected to cause take at an occupied murrelet site adjacent to the unit. BLM is not requiring a 300-foot buffer around this site because it was discovered under the NWFP. However, under the version of the Murrelet

Management Direction that FWS consulted on for purposes of the RMP BiOp, BLM would have had to provide a 300-foot buffer around this site and take of murrelets might have been avoided.

95. BLM is also implementing the modified Murrelet Management Direction in the Baker's Dozen Timber Harvest, an ongoing BLM Coos Bay District logging project approved in December 2025. As with Big Weekly Elk, BLM is not requiring a 300-foot buffer around NWFP-delineated occupied murrelet sites. BLM has already sold several timber sales under this project, and another sale is scheduled for November 20, 2026.

96. On April 2, 2026, the Center provided notice of its ESA citizen suit claim to Defendants via email and certified mail as required by 16 U.S.C. § 1540(g). Although not required, the Center also provided notice of its APA claim in that letter.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### FWS's Effects and 7(a)(2) Analysis Memo Is Arbitrary, Capricious, an Abuse of Discretion, or Not in Accordance With the ESA

97. The Center realleges and incorporates the allegations in this Complaint by reference.

98. FWS's September 23, 2019 Effects and 7(a)(2) Analysis Memo is a "final agency action" within the meaning of the APA.

99. In its Effects and 7(a)(2) Analysis Memo, FWS indicated that BLM's modified Murrelet Management Direction was likely to adversely affect marbled murrelets but concluded that not requiring 300-foot buffers around marbled murrelet sites designated as occupied under the NWFP did not change FWS's no-jeopardy determination in the RMP BiOp.

100. FWS's Effects and 7(a)(2) Analysis Memo was arbitrary, capricious, an abuse of discretion, or contrary to the ESA for at least the following reasons:

a. FWS failed to consider all the effects of BLM's modified Murrelet Management Direction to murrelets and their critical habitat, including but not limited to effects to murrelet critical habitat and effects stemming from the fact that under BLM's modified interpretation, the Direction and its ensuing protections would be triggered less frequently than FWS's understanding when it prepared the RMP BiOp. For example, FWS did not consider that, under the modified Direction, BLM would survey for murrelets less frequently than FWS had anticipated and thus discover and protect fewer occupied murrelet sites and less habitat than FWS expected under its interpretation of the Direction. FWS's Memo also failed to include any analysis regarding the effects of BLM's modified Direction to murrelet recovery, and whether or how the modified Direction might change FWS's conclusion in the RMP BiOp that the RMPs would provide for murrelet recovery.

b. FWS's Memo was procedurally improper. BLM's modified interpretation involved a major change to the effects analysis in FWS's RMP BiOp and/or a change to that BiOp, but rather than engage in a new, full consultation FWS subverted its own procedures by reiterating its no-jeopardy conclusion from the RMP BiOp based on a cursory and incomplete analysis and without requiring BLM to provide a biological assessment, without gathering and reviewing all relevant available information, and without adequately evaluating and providing a detailed discussion of the effects of BLM's modified Direction to murrelets and their critical habitat and an adequate, detailed, and rational explanation for its no-jeopardy opinion, as required by the ESA and its implementing regulations. *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.14(f), (g), (h).

c. FWS failed to rationally address the best available science regarding edge

effects and their impacts to murrelets and the importance of providing a 300-foot buffer around occupied sites for the conservation of murrelets.

d. There is no valid rationale or scientific basis for applying less protections to marbled murrelet sites designated as occupied under the NWFP as opposed to sites designated as occupied under the RMPs, and FWS's conclusion that doing so would not jeopardize murrelets or destroy or adversely modify murrelet critical habitat discounted, ignored, and/or contradicted the best available science regarding murrelet site fidelity and use of nesting habitat.

e. FWS's Memo is irrational and internally inconsistent, in that it recommends that BLM provide a 300-foot buffer around all occupied murrelet sites in Inland Zone 1 yet nonetheless concludes that BLM's decision not to follow this recommendation would not jeopardize the continued existence of the murrelet, and FWS failed to offer an adequate explanation for this inconsistency.

101. Despite the significant effects that BLM's modified Murrelet Management Direction might have on murrelets, FWS's Effects and 7(a)(2) Analysis Memo was cursory, lacked any reasoned or satisfactory explanation for the decision made, failed to consider and follow the best available science, failed to articulate a rational connection between the facts found and the choice made, failed to consider all the effects of BLM's modified Direction on murrelets, and failed to follow the proper procedures for ESA section 7 consultations. Therefore, for at least these reasons, FWS's Effects and 7(a)(2) Analysis Memo is arbitrary, capricious, an abuse of discretion, or not in accordance with the ESA, and is actionable pursuant to the APA. 5 U.S.C. § 706(2)(A).

**<u>SECOND CLAIM FOR RELIEF (in the alternative to the First Claim for Relief)</u>**

**BLM and FWS Failed to Reinitiate Consultation in Violation of ESA section 7(a)(2)**

102. The Center realleges and incorporates the allegations in this Complaint by reference.

103. The ESA places ongoing obligations on federal agencies to ensure that their actions do not jeopardize the continued existence of endangered species or adversely modify or destroy their designated critical habitat, including the duty to reinitiate section 7 consultation in four circumstances. 50 C.F.R. § 402.16(a)(1)–(4) (2023); *see also* 16 U.S.C. § 1536(a)(2).

104. Pursuant to the ESA and its implementing regulations, either the action agency or FWS must reinitiate consultation "where discretionary federal involvement or control over the action has been retained or is authorized by law" and "the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence." 50 C.F.R. § 402.16(a)(3) (2023).

105. BLM has discretionary involvement or control over implementation of the RMPs.

106. Since FWS issued the RMP BiOp, the RMPs' Murrelet Management Direction has been modified in a manner that causes an effect to marbled murrelets and their critical habitat that was not considered in the BiOp.

107. BLM and FWS have not reinitiated consultation on BLM's modified version of the Murrelet Management Direction.

108. As such, BLM and FWS are in violation of ESA section 7(a)(2) and its implementing regulations.

**PRAYER FOR RELIEF**

For all the above-stated reasons, Plaintiff requests this Court award the following relief:

1. Declare that FWS's September 23, 2019 Effects and 7(a)(2) Analysis Memo was arbitrary, capricious, an abuse of discretion, or not in accordance with the ESA;

2. Vacate and set aside FWS's Effects and 7(a)(2) Analysis Memo;

3. Declare that BLM and FWS have violated the ESA by failing to reinitiate consultation on BLM's Marbled Murrelet Management Direction in the RMPs;

4. Enjoin BLM from authorizing or implementing any logging activities and timber sales authorized under the Northwestern and Coastal Oregon or Southwestern Oregon RMPs until BLM and FWS complete reinitiated consultation on BLM's modified Marbled Murrelet Management Direction;

5. Award Plaintiff costs, expenses, and reasonable attorney's fees as authorized by the Equal Access to Justice Act, 28 U.S.C. § 2412(d), the Endangered Species Act, 16 U.S.C. § 1540(g)(4), and any other authority; and

6. Grant Plaintiff any such other and further relief as the Court deems just and proper.

Respectfully submitted this 23rd day of November, 2026.

s/ Lia Comerford
LIA COMERFORD
OSB No. 141513
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211-0374
Phone: 971-717-6420
Email: lcomerford@biologicaldiversity.org

LINDSAY REEVES
(*Pro hac vice* forthcoming)
La. Bar No. 32703
Center for Biological Diversity
3436 Magazine Street, FRNT PMB 539
New Orleans, LA 70115

Phone: 504-342-4337
Email: lreeves@biologicaldiversity.org

BRIAN SEGEE
(*Pro hac vice* forthcoming)
Cal. Bar No. 200795
Center for Biological Diversity
226 W. Ojai Ave., Suite 101-442
Ojai, CA 93023
Phone: (805) 750-8852
Email: bsegee@biologicaldiversity.org

*Attorneys for Plaintiff*